*Highgate Housing Limited Partnership v. Macaulay-Fisher*, No. 40-1-15 Wncv (Teachout, J., August 11, 2015)

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

## STATE OF VERMONT

**SUPERIOR COURT**                                    **CIVIL DIVISION**
**Washington Unit**                                   **Docket No. 40-1-15 Wncv**

**HIGHGATE HOUSING LIMITED PARTNERSHIP**
    **Plaintiff**


    **v.**


**JOSHUA MACAULAY-FISHER and**
**KARISSA MACAULAY**
    **Defendants**


### FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

This matter came before the Court for final hearing on the merits on July 7, 2015. Plaintiff is represented by Attorney Nadine L. Scibek. Defendants are represented by Attorney Jean L. Murray. Post-trial memoranda were filed.

Plaintiff seeks eviction and a judgment for unpaid rent. Defendants claim proper notice was not given as required by federal regulations incorporated into lease terms, and that therefore there was no rent due and no basis for eviction.

### Findings of Fact

On November 1, 2013, Defendants rented an apartment at 35 Skyline Drive, Apt. 44 in Barre in the Highgate Apartment complex, in which apartments, including the one rented by Defendants, receive Section 8 subsidies from the U.S. Department of Housing and Urban Development (HUD). The owner processes the subsidies under HUD regulations. In this case that is done by the owner's manager, Maloney Properties.

The amount of the subsidy is based on the tenant's income. HUD regulations specify how income is to be verified and rent and subsidy amounts calculated. Certain terms are required to be included in leases, and Plaintiff uses HUD's model lease form that incorporates these requirements. These terms require that when changes in income and household composition occur, tenants must provide information and an Interim Recertification takes place to review income and recalculate whether the rent and subsidy amounts should change. If income decreases, a decrease in the tenant's share of rent can be retroactive to the date of income decrease. If income increases, resulting in an increase in the share to be paid by the tenant, there is a requirement of 30 days advance notice of the increase in rent.

HUD terms also require a regular Annual Recertification at which time tenants are required to update information about current household income. For both Interim and Annual

Recertifications, Tenants must provide income information, and it is the owner's responsibility to obtain third-party verification of the information provided by the tenant.

Lease (Exhibit 1) terms relevant to the issues in this case include:

¶ 4.  <u>Changes in the Tenant's Share of the Rent:</u>  The Tenant agrees that the amount of rent the Tenant pays and/or the amount of assistance that HUD pays on behalf of the Tenant may be changed during the term of this Agreement if:
   . . .c.  the income, the number of persons in the Tenant's household or other factors considered in calculating the Tenant's rent change and HUD procedures provide that the Tenant's rent or assistance payment be adjusted to reflect the change;
   . . .f.  the Tenant fails to provide information on his/her income, family composition or other factors as required by the Landlord.
The Landlord agrees to implement changes in the Tenant's rent or tenant assistance payment only in accordance with the time frames and administrative procedures set forth in HUD's handbooks, instructions and regulations related to administration of multifamily subsidy programs. The Landlord agrees to give the Tenant at least 30 days advance written notice of any increase in the Tenant's rent except as noted in paragraphs 11, 15 or 17.  The Notice will state the new amount the Tenant is required to pay, the date the new amount is effective, and the reasons for the change in rent.  The Notice will also advise the Tenant that he/she may meet with the Landlord to discuss the rent change.

¶ 15.  <u>Regularly scheduled Recertifications:</u>  Every year around the first day of <u>July,</u> the Landlord will request the Tenant to report the income and composition of the Tenant's household and to supply any other information required by HUD for the purposes of determining the Tenant's rent and assistance payment, if any. The Tenant agrees to provide accurate statements of this information and to do so by the date specified in the Landlord's request.  The landlord will verify the information supplied by the Tenant and use the verified information to recompute the amount of the Tenant's rent and assistance payment, if any.

¶ 16.  <u>Reporting Changes Between Regularly Scheduled Recertifications:</u>
   a.   If any of the following changes occur, the Tenant agrees to advise the Landlord immediately.
      1.  [not pertinent]
      2.  [not pertinent]
      3.  The household's income cumulatively increases by $200 or more a month
   b.  The Tenant may report any decrease in income or any change in other factors considered in calculating the Tenant's rent.  Unless the Landlord has confirmation that the decrease in income or change in other factors will last less than one month, the Landlord will verify the information and make the appropriate rent reduction.  However, if the Tenant's income will be partially or fully restored within two months,

2

the Landlord may delay the certification process until the new income is known, but the rent reduction will be retroactive and the Landlord may not evict the Tenant for nonpayment of rent due during the period of the reported decrease and the completion of the certification process. The Tenant has thirty days after receiving written notice of any rent due for the above described time period to pay or the Landlord can evict for nonpayment of rent. (Revised 3/22/89)

    c. If the Tenant does not advise the Landlord of these interim changes, the Landlord may increase the Tenant's rent to the HUD-approved market rent. The Landlord may do so only in accordance with the time frames and administrative procedures set forth in HUD's regulations, handbooks and instructions on the administration of multifamily subsidy programs.

    d. [not pertinent]

¶ 17. Removal of Subsidy:

    (a) The Tenant understands that assistance made available on his/her behalf may be terminated if events in either items 1 or 2 below occur. . . .In addition, if the Tenant's assistance is terminated because of criterion (1) below, the Tenant will be required to pay the HUD-aproved market rent for the unit.

    (1) The Tenant does not provide the Landlord with the information or reports required by paragraph 15 or 16 within 10 calendar days after receipt of the Landlord's notice of intent to terminate the Tenant's assistance payment.

    . . .

¶ 18. Tenant Obligation to Repay

    If the tenant submits false information on any application, certification or request for interim adjustment or does not report interim changes in family income or other factors as required by paragraph 16 of this Agreement, and as a result, is charged a rent less than the amount required by HUD's rent formulas, the Tenant agrees to reimburse the Landlord for the difference between the rent he/she should have paid and the rent he/she was charged. The Tenant is not required to reimburse the Landlord for undercharges caused solely by the Landlord's failure to follow HUD's procedures for computing rent or assistance payments.

The portion of the HUD Handbook related to Recertification and rent changes (Exhibit B) includes the following provisions relevant to this case:

**Section 2: Interim Recertification**
    **…7-10 Key Requirements**
    A. To ensure that assisted tenants pay rents commensurate with their ability to pay, tenants must supply information requested by the owner or HUD for use in an interim recertification of family income and composition in accordance with HUD requirements. . . .

### . . .7-11  Owner Responsibilities

A.   Owners must process an interim recertification if a tenant reports:
. . .4.  Most decreases in income except in the circumstance described in subparagraph D below. . .

B.   [not pertinent]

C.  Upon receiving a tenant request for an interim recertification, owners must process a recertification of family income and composition within a reasonable time, which is only the amount of time needed to verify the information provided by the tenant.  Generally, this should not exceed 4 weeks.

D.  [not pertinent]

E.  [not pertinent]

F.  Owners may delay, but not refuse, to process an interim recertification if they have confirmation that a tenant's income will be partially or fully restored within two months.  Processing may be delayed only until the new income is known. . . .

    1.  [not pertinent]

    2.  Once owners are able to verify the tenant's new income, they must do as follows:

        a.   Recertify the tenant, as described in paragraph 7-12.

        b.   Retroactively apply any reduction in rent to the first day of the month after the date of the action that caused the decrease in income.

        c.   Notify the tenant in writing of any rent due for the period of delay.  If the tenant fails to pay this amount within 30 days of notification, the owner may pursue eviction for nonpayment of rent.

### . . .7-12  Processing Interim Recertifications

A.   When a tenant requests an interim recertification or when a tenant reports changes in income or other circumstances as required, the owner must take the following steps when processing an interim recertification.

    1.   [not in dispute]

    2.  Obtain third-party verification of the income or other facts reported as changed since the last recertification and maintain documentation in the tenant file.  (See Chapter 5, Section 3 for more information about verification.)

    3.  [not pertinent]

    4.  Document the resulting changes in the tenant's rent and assistance payment by obtaining signatures on the HUD-50059 from the head, co-head, and spouse and all other adult family members.  . . .

### . . .7-13  Effective Date of Interim Recertifications

…D.  If the tenant does not comply with the interim reporting requirements, and the owner discovers the tenant has failed to report changes as required in paragraph 7-10, the owner initiates an interim recertification and implements rent changes as follows:

1. Rent increases. Owners must implement any resulting rent increase retroactive to the first of the month following the date that the action occurred.
2. [not pertinent]

As of November 1, 2013, when the lease began, the tenants' share of rent was $610 per month (less than market rent), and the tenants paid rental amounts due through December.

On December 18, 2013, Defendant Joshua MacAulay-Fisher reported that he had ended his employment at Capital Candy, and would be starting another job providing personal services through ARIS. He met with Sarah Smith of Maloney Properties, Inc., Plaintiff's property manager, on that day. He signed the verification that he had been terminated from Capital Candy. He also signed releases giving authorization to Plaintiff to obtain information from both Capital Candy and ARIS.

He began work for ARIS in mid-January, but because his employer did not immediately complete the required background check for the type of work he did, and because he could not receive pay until the background check had cleared, he did not begin to receive any pay for several weeks. Tenants paid no rent in January or February. Karissa MacAulay testified that she believed no rent was due because they had no income. They had provided notice and signed all requested waivers. Although no paperwork changing the subsidy was processed at that time, when processing later occurred, the tenants were treated as having had no income for that period, and charged retroactively with only nominal rent of $22 per month rather than the previous rent of $610 per month. Plaintiff does not claim any more than $22 per month for January or February.

As of March 1, 2014, Joshua was fully employed and receiving income from ARIS, but had not provided Plaintiff with the amount of his earnings. Plaintiff had not used the release to contact ARIS to verify income. Defendants had received no notice from Plaintiff about the amount of rent due now that Joshua was working. Plaintiff's manager testified that it was waiting to receive paystubs from Joshua and that it was Joshua's responsibility to provide this information based on his agreement to do so on the "Interim Recertification Reporting Intake Form" (Exhibit C) that he signed on December 18th. This is a two page standard form prepared by Plaintiff's manager Maloney Properties, Inc. (not an official HUD form). The first page has basic information about the reason for a change and the name of the new employer. On page 2 is the following paragraph:

I certify that I have signed the applicable 3rd party verification form(s) and if this is [sic] interim notification is employment-related, it is my responsibility in accordance with my Lease and HUD Regulations, to provide management with my first four (4) consecutive paystubs as soon as the 4th is received. Management may request two (2) more if there are any inconsistencies with the first four. If a Recertification was completed based on 3rd party documentation received before management receives/reviews my paystubs, I understand that a recertification/rent correction may be necessary based on my paystub calculations in accordance with HUD Regulations.

5

Joshua signed directly under this paragraph on December 18, 2013. He did not start receiving paychecks (with paystubs) until March. Paychecks were biweekly. Under this provision, paystubs would have been due around the first of May.

On April 9, 2014, Joshua signed a new release to Plaintiff authorizing ARIS to verify employment information to Plaintiff. On April 11, 2014, Plaintiff's manager telephoned ARIS and verified that Joshua had started work on January 16, 2014. The evidence does not show whether Plaintiff asked for or obtained from ARIS information about the amount of Joshua's income, and if not, why not. By this time, Joshua had worked and been paid for between 2 and 3 months.

Based on the Lease at ¶ 16(b) and HUD Handbook Section 7-11(F), both cited above, it was reasonable for Plaintiff to delay the interim recertification until the first of May for two reasons: (1) as of December 18, 2013 it appeared that Joshua's income was going to be at least partially restored within two months, and under those circumstances, an interim certification can be delayed (Lease at ¶ 16(b)); and (2) ARIS would not have given Joshua 4 paystubs until the end of April. On April 29, 2014, tenants paid $300.

There is no evidence that in May of 2014, Plaintiff did anything to verify the ARIS income, or to ask Defendant for paystubs. Plaintiff's witness testified that it could not proceed until Joshua brought in paystubs, and testified that a letter it sent on May 1, 2014 was a "reminder" to bring in paystubs, but it says nothing about paystubs. The letter is a standard form Notice "that is being sent to remind you that, as a recipient of Section 8 assistance, HUD requires you to report the following interim changes to your household composition and income to the site management office when such changes occur: . . .4. **The family's income cumulatively increases by $200 or more per month."** This Notice does not specify a need for pay stubs. At the top, it identifies "Current Gross Household Income on File" as $27,186, and "Date of Last Recertification" as "5/01/2014 (MI)". This document does not match the circumstances at the time, as there had been no Recertification on May 1, 2014. Months earlier, Joshua had not only informed Plaintiff of his ARIS employment but had signed releases authorizing verification of income. Plaintiffs had done nothing to verify, and this letter was a standard form letter automatically sent; it was not a reminder or notice to Joshua that he had an obligation to provide paystubs or he could be retroactively charged market rent.

Plaintiff's manager verified with Capital Candy on May 11, 2014 that Joshua had terminated employment there on December 15, 2013. This verification of termination of employment did not take place until five months after Defendants gave notice of it. The evidence does not show any attempt within that period to verify the amount of Joshua's income at ARIS, nor to notify Defendants that unless they provided the paystubs, they would be treated as failing to provide income information. Plaintiff's witness testified that from March on, Defendants were given reminders to submit paystubs, but the testimony was vague and nonspecific and in the passive voice (e.g., "they were reminded") with no specific information about who spoke or wrote to whom and what was said or written. The evidence is not sufficiently specific to credibly support a finding that Defendants failed to provide income information when they had signed releases twice enabling Plaintiff to verify income with ARIS.

On June 8th, Plaintiff's manager telephoned ARIS and verified that Joshua worked up to 40 hours per week. The next day, June 9th, 2014, ARIS completed a verification form showing that Joshua was working full time and had an anticipated gross annual pay of $32,136. It is reasonable to infer that if Plaintiff had made the call to ARIS sooner, it would have received this information sooner.

Despite having this information about annualized income, Plaintiff's manager did not complete processing the Interim Recertification or send a notice of an amount of rent due. At this point, Plaintiff had the information about Joshua's income verified by his employer, and it showed that his income was too high to qualify for a subsidy. Under 7-11(F)(1), (2)(a) and (c), Plaintiff had sufficient information to make an Interim Certification that Defendants no longer qualified for a subsidy as of March 1, 2015. It could have given notice of the market rent due for March, April, May, and June and if such rent was not paid within 30 days, it could have proceeded with eviction. Lease at ¶ 16(b). It did not act on that information: it did not give notice that would have supported eviction based on nonpayment of an amount determined retroactively due to a legitimate delay under 7-11(F)(1), (2)(a) and (c). It also gave no 30-day notice of a new amount of rent to be due at the market rate, which it could have done. Such notice could have made the new rental amount effective starting August 1, 2014.

Plaintiff's manager claims that it was not required to complete the Interim Recertification at that time because Defendants had not provided the pay stubs.

On July 1, 2014, Plaintiff's manager sent tenants a Notice of Annual Recertification in anticipation of the Annual Recertification for determination of the monthly rental as of the anniversary date of November 1, 2014. This called for Defendants to provide income information (as in the circumstances of an Interim Certification), and for the owner to obtain third-party verification. HUD regulations required Plaintiff to process the Annual Recertification enough in advance to give the tenants 30-day advance notice of any rent increase, and the Lease requires 30-day advance notice of a rent increase.

On July 18, 2014, Plaintiff hand delivered and sent a Notice of Termination of Lease as of August 1, 2014 for nonpayment of rent in the amount of $3,973. It is uncertain how this amount was calculated. Plaintiff apparently did not pursue eviction based on this notice.

Joshua responded to the July Notice of Annual Recertification and scheduled an appointment. Both Defendants met with Plaintiff's manager on July 29, 2014. Joshua again signed releases authorizing third-party verification. The next day, Plaintiff's manager received a fax from ARIS with a complete printout of detailed payroll information for the period of his employment, from January 16, 2014 through July 30, 2014. His total wages during that period were $20,141.64. His monthly average was $3,000, which was well over the $2,666 ($2,465 + 200 = $2,666) amount that would trigger review based on the May 1 letter. Plaintiff could have immediately given notice of a rent increase to market rent that could have become effective as early as September 1, but did not give any notice of rent increase.

Plaintiff's manager did not use this information, although detailed and directly from ARIS, to complete the Interim Certification process because it considered that Joshua had not

7

met *his* responsibility to provide information. Plaintiff's position was that it did not need to act on the Interim Recertification until Joshua had provided paystubs. Plaintiff's evidence is that from January on, Plaintiff's manager had not been able to complete verification due to tenants' failure to provide the necessary paystubs, despite the fact that Plaintiff had directly from ARIS both a verification statement of employment and amount of compensation, and a printout of actual income for every paycheck from January through July 18th.

Plaintiff had the information that the paystubs would have provided. Both the printout and the paystubs are the kind of third party verification that Plaintiff is required to obtain, as both are the employer/payor's declaration of the amount of income paid to Defendant. While paystubs provide such information, and in many situations they may provide the best method of obtaining that information, they are not the only source of the needed information.

Plaintiff claims that the printout is not sufficient because it does not show verification of the specific number of hours Joshua worked to provide personal services to specific persons. There is nothing in either HUD regulations or the Maloney Intake Form Joshua signed that requires the number of hours worked. There is reasonable justification for needing to know number of hours worked if calculations need to be done to make an annualized income figure, which HUD apparently requires, but ARIS had provided the specific information about actual biweekly income for approximately 6 months, which was sufficient to make this calculation.

In any event, Plaintiff did not give any 30-day notice of the amount of rent due, but justifies its continued delay of the Interim Recertification on Joshua's failure to provide paystubs. Plaintiff also did not act on the Annual Recertification process.

On August 8th, Plaintiff's manager telephoned ARIS and verified that Joshua continued to work full time. It had not yet given tenants any notice of recalculation of the amount of rent due or loss of subsidy. It continued its position that tenants had not met their responsibilities to provide necessary information because the paystubs had not been submitted. The Interim Recertification was uncompleted, and the Annual Recertification was also pending. The Defendants received no notices of rent due. On August 21, 2014, they paid $200.

Plaintiff's manager, apparently without receiving any more information than Plaintiff already had, issued the following letters arising out of the Interim Certification to Joshua on the following dates:

October 7, 2014:
−An Interim Recertification letter determining that retroactive to 1/1/14 the rental amount was $22 per month. (Exhibit D)
−An Interim Recertification letter determining that retroactive to 3/1/14 the rental amount was $931 per month. (Exhibit G) (this was market rent)
−An Interim Recertification letter determining that retroactive to 7/1/14 the rental amount was $924 per month. (Exhibit H) (this was market rent with an adjustment)

These letters stated that Joshua was required to come in within 7 days to sign an HUD 50059 Form to confirm the income information that was the basis for the calculation. The letters do not

explain why retroactive rent was being charged, or why there was no 30-day notice. Joshua did not go in immediately.

November 24, 2014, Plaintiff's manager sent another Interim Recertification letter determining that retroactive to 1/1/14 the rental amount was $22 per month. (Exhibit I, identical to Exhibit D except for the date of the letter.)

On that day, November 24, 2014, Joshua met with Plaintiff's manager and signed the HUD-50059 form. On this form, he confirmed the termination of subsidy due to ineligibility and "moving to market rent." The effective date is given as 2/28/14, although the document does not specify to which one or more of the four letters described above it was related, and it does not identify any amount of rent. The "Anticipated Voucher Date" is given as 12/01/2014. There is no waiver of the right to 30-day notice of rent increase.

Plaintiff's manager's testimony was that Joshua's signing of the 50059 form concluded the Interim Certification process, which could not be completed sooner because the tenants failed to provide the paystubs, and that the Annual Certification was not processed because the Interim Certification resulted in disqualification for a subsidy.

The October letters described above were the first and only notices of rent amounts due that the tenants received after giving notice on December 18, 2013 of change in employment, at which time they had identified the new employer and authorized verification of income.

Plaintiff claims that Defendants' rental obligation is based on the amounts in those letters:
January and February: $22 per month
March, April, May, June: $931 (market rent)
July through December: $924 (market rent adjusted for an unrelated reason)

On December 11, 2014, Plaintiff sent and hand-delivered to Joshua a Notice of Termination of lease based on nonpayment of $9,530, and specifying that the lease would terminate as of December 31, 2014 if $9,530 was not paid on December 11, 2014. Tenants had paid no rent in 2014 after August. Plaintiff's manager and Joshua met that day and reviewed the basis of Plaintiff's calculation of rent due.

On January 2, 2015, Joshua reported a change of jobs resulting in reduction of income and submitted a new Request for Recertification which requested an Interim Certification.

On January 11, 2015 this suit was filed, based on the termination date of 12/11/14 in the Notice of Termination.

On March 24, 2015, Plaintiff's manager issued an Interim Recertification letter determining that retroactive to 1/1/15 the rental amount was $764 per month. The evidence did not include any information about what income information was used or how it was obtained.

Also on March 24, 2015, a hearing was held in this case on Plaintiff's motion for rent to

9

be paid into court and a Rent Escrow Order issued requiring monthly rental payments of $764, which were made into court as required by the Order to the date of hearing.

## Conclusions of Law

Plaintiff seeks eviction based on nonpayment of rent, and a money judgment of $14,600 based on the above-described rental rates, minus the escrow funds held by the court and the $500 paid in 2014 and credit for a security deposit of $556. Plaintiff also seeks attorney's fees. Defendants claim that no rent is due because they complied with their responsibilities to report changes in income and give releases for verification, and they never received a required 30-day notice of any amount of rent due that would have triggered their obligation to pay rent from March 1st on in any amount greater than $22 per month.

### *Preliminary procedural matters*

Plaintiff attached to its July 21, 2015 Response to Defendants' Trial Memorandum a document that was not offered into evidence at the evidentiary hearing. This submission is too late, and the court has not considered it. See *In re Bjerke Zoning Permit Denial*, 2014 VT 13, ¶ 16, 195 Vt. 586 (2014) (noting that the submission of evidence after trial but before the final judgment is discretionary with the court). Plaintiff did not ask to reopen the evidence and provided no explanation why the new submission could not have been offered into evidence at trial.

Similarly, Defendants attached to their July 27, 2015 Response to Plaintiff's Trial Memorandum a document that was also not offered into evidence at the evidentiary hearing. This submission is also too late, and the court has not considered it.

Defendants filed on July 23, 2015 a Motion to Reconsider the July 7, 2015 denial on the record of its Motion to Add Counterclaim. This Motion to Reconsider is denied. The court affirms the reasoning stated on the record on July 7, 2015.

### *Conclusions of Law on Disputed Issue of Liability for Rent*

It is undisputed that Plaintiff is seeking to collect rent of $931, $924, and $764 for various months without having given 30 days advance notice of rent due in those amounts, or having given 10-day notice of loss of subsidy.

Plaintiff relies on Section 7-13, Paragraph D of the HUD Handbook, quoted above as the basis for its position that from March on, Joshua's income increased and he did not comply with reporting requirements, and that therefore Plaintiff is entitled to retroactively claim an increase in rent in the amount of market rent as of March 1, 2014. Plaintiff also relies on the fact that on November 24, 2014, Joshua confirmed on the HUD-50059 form that his income exceeded the amount that qualified for a subsidy, and that he therefore owed market rent as set forth in the October letters.

10

Defendants claim that Joshua provided sufficient information about his employment and signed timely releases authorizing verification, that Plaintiff did not meet its own responsibilities to verify income as required by Lease ¶ 4(f) (owner must follow HUD handbook procedures) and HUD Handbook 7-12 Paragraph A(2) ("owner must . . . [o]btain third party verification"), and that because Plaintiff did not give 30-day notice of any rent increase after March 1, 2014, Plaintiff cannot claim rents due for that period above the $22 per month that went into effect January 1, 2014.

There are three time periods about which the evidence is clear:

January and February 2014:  Monthly rental was $22

December 2014:                  Monthly rental was $924
        (Notice of at least 30 days was provided in the October 7, 2014 letter.)

January 2015 to the present:   Monthly rental was and is $764
        (The $764 rental amount was a retroactive reduction from the $924 about which notice had been provided in the October 7, 2014 letter.)

The primary dispute is over the nine-month period of March through November of 2014.

Many facts are undisputed.  From March through November, household income was above the amount that would have qualified for a subsidy, and during that period Defendants paid only $500 in total.  Joshua had provided timely releases for verification of his status and income from both his old employer and his new one.  He did not provide paystubs from ARIS.  Plaintiff recognized that he had no income in January and February.  No 30-day notice of rent increase was ever provided to Defendants.  No 10-day notice of loss of subsidy was ever provided to Defendants.

Plaintiff is understandably frustrated that Defendants' income for March to November was sufficient to pay market rent and Defendants paid only $500.  The issue, however, is whether, based on the terms of the lease, Plaintiff is entitled to claim unpaid rent for March on in any amount greater than $22 per month.  If, as Defendants claim, they were only obligated to pay $22 per month from March on, they have overpaid, and there is no basis for eviction.  If Plaintiff's claim for greater rent is justified, they have underpaid, and Plaintiff is entitled to possession and a judgment.

Under ¶ 4 of the Lease, "[t]he Landlord agrees to give the Tenant at least 30 days advance written notice of any increase in the Tenant's rent except as noted in paragraphs 11, 15 or 17."  The initial question for analysis is whether one of these exceptions applies.  It is the Plaintiff's burden to prove underpayment of rent, and in this case that means proving that an exception in the Lease applies.  That is especially so in this case because this is a standard form lease that Plaintiff has chosen and presented to tenants without the opportunity for negotiation.

11

<u>Applicability of Exceptions:</u>
*Paragraph 11* is not at all relevant.

*Paragraph 15* relates to Annual Recertifications. It requires the Tenant to "provide accurate statements of *this information* and to do so by the date specified in the Landlord's request." (Emphasis added.) *This information* refers to the prior sentence: "the income and composition of the Tenant's household and to supply any other information required by HUD for the purposes of determining the Tenant's rent and assistance payment, if any." Plaintiff's July 1, 2014 Annual Recertification (Exhibit E) required Defendants to set up an appointment to meet, which they did and the meeting occurred on July 29, 2014, and it specified that the Defendants were to provide the following information: "Receipts or stubs for employment . . . ." On July 30, 2014, the day after the meeting, Plaintiff had the fax from ARIS showing detailed payroll information from January 16, 2014 through July 30, 2014. The court cannot conclude that Defendants failed to comply with requirements such that the exception in Paragraph 15 relieved Plaintiff from providing a 30-day notice of rent increase retroactive to March 1, 2014.

*Paragraph 17* concerns Removal of Subsidy. The relevant portion appears to be ¶ 17(a)(1) which authorizes termination of a subsidy if "Tenant does not provide the Landlord with the information or reports required by paragraph 15 or 16 within 10 calendar days after receipt of the Landlord's notice of intent to terminate the Tenant's assistance payment." Plaintiff never actually sent a notice of intent to terminate the Defendant's subsidy. The October letters come the closest, but Plaintiff's witness testified that they were the final determinations in the Interim Certification process (although they do not say so). They also do not clearly express an intent to terminate a subsidy; rather they simply state an amount of rent for retroactive periods, which is market rent but the letters do not state that it is market rent and do not state that they mean a removal of subsidy; nor do the letters provide a 10-day period to provide information. The court cannot conclude that the exception in Paragraph 17 relieved Plaintiff from providing a 30-day notice of rent increase.

Thus, Plaintiff has not proved the applicability of any exception to the requirement of 30-day advance notice of any increase in rent, except that, as noted above, the October 7 letter amounted to a 30-day notice of increase in rent to begin no sooner than 30 days after the notice, so the first effective date was December 1, 2014.

Plaintiff's justification for being able to claim rental amounts due retroactively without a 30-day notice of rent increase is Paragraph 18 of the Lease, which is entitled "Tenant Obligation to Repay" and provides as follows:

> If the tenant submits false information on any application, certification or request for interim adjustment or does not report interim changes in family income or other factors as required by paragraph 16 of this Agreement, and as a result, is charged a rent less than the amount required by HUD's rent formulas, the Tenant agrees to reimburse the Landlord for the difference between the rent he/she should have paid and the rent he/she was charged. The Tenant is not required to reimburse the Landlord for undercharges caused solely by the Landlord's failure to follow HUD's procedures for computing rent or assistance payments.

12

Defendants did not provide any false information or fail to report a change in income. They reported the change of employment in December of 2013, and signed releases authorizing verification of income.

Plaintiff argues that Defendants' failure to provide paystubs amounts to a failure to provide information under Paragraph 4(f) of the Lease: "the amount of assistance . . . may be changed during the term of this Agreement if . . . (f) the Tenant fails to provide information on his/her income, family composition or other factors *as required by the Landlord*." (Emphasis added.) Plaintiff's argument is that it is authorized to require paystubs, that it required paystubs and Defendants agreed to that by signing the Intake Form, and that since they never provided the paystubs, Plaintiff was justified in retroactive imposition of market rent with no subsidy.

There are two problems with this argument. First, Paragraph 4 continues by providing that even under Paragraph 4, the Landlord is required to implement rent changes in accordance with HUD procedures and time frames, and further requiring the 30-day advance written notice of any increase except for the exceptions in paragraphs 11, 15, and 17, which have already been determined above to be inapplicable. Second, while, depending on the circumstances, it could be reasonable for a landlord to require paystubs to be provided, the concentrated reliance on Joshua *himself* having to provide the paystubs (based on the Intake Form) is unreasonable when the content was either available to Plaintiff or in Plaintiff's possession as verification from mid-January on until it acted on that information in October. It was not reasonable for Plaintiff to rely on noncompliance with the Intake Form "certification" as a reason to delay the Interim Recertification, certainly not past July, especially when there is insufficient evidence of Plaintiff having reminded Joshua of the necessity of that information.[1]

Plaintiff argues that it is unreasonable for Defendants to have been earning income throughout 2014 at a level that should have resulted in market rent with no subsidy, and to have paid only $500 during that period. Plaintiff participates in a government subsidy program with many procedural requirements that it administers, requiring the use of a lease with procedural protections for both parties. As the Findings show, it had the opportunity to protect itself fully in several ways: (1) by acting on the releases in a more timely fashion and giving 30-day notice as early as February 1, which could have been effective as of March 1, or at various later times; or (2) by relying on ¶ 16(b) of the Lease as a basis for delaying the Interim Certification until June, at which point it had grounds and information for sending 30-day notice of retroactive market rent due for March, April, May, and June, which, if not paid within 30 days, could have supported eviction. Plaintiffs also had the opportunity to document any efforts to require Defendants as tenants to provide paystubs.

Defendants, on their part, provided timely notice of change in employment, executed releases to enable income verification multiple times, and from December of

---

[1] As noted in the Findings of Fact, although it is possible that such reminders were given, the quality of the evidence was insufficient to establish that they were given.

2013 until October of 2014, never received any notice of either an increase or decrease in rent. It was obvious that their rental payment would change as a result of the change in jobs in December 2013 and January 2014, but the Lease required a 30-day advance notice of any increase in rental amount due, and they never received such a notice until October of 2014. While it is true that they did not provide paystubs, the evidence is not clear that they knew on an ongoing basis that Plaintiff was holding them to an obligation on the Intake Form signed in December, and would use the failure to adhere to that obligation as a basis for charging 9 months' worth of retroactive market rent.

As between Plaintiff and Defendants, Plaintiff had clear opportunities to protect itself under the Lease, whereas Defendants did not have advance notice of the amount of rent they were required to pay, as their Lease assured them they were entitled to have.

Defendants argue the Consumer Protection Act as an affirmative defense to liability. Assuming without deciding that the Act may function as an affirmative defense in a case where Defendants may not raise it as a counterclaim, the court nevertheless perceives no basis for relief. There is no question that the Act applies to the landlord–tenant relationship. *Bisson v. Ward*, 160 Vt. 343, 350 (1993). However, this does not mean that any dispute arising out of a rental agreement is consumer fraud. The Vermont Supreme Court has made clear that the Act "is concerned with the contents of advertisements and offers—that is, elements of contract formation—and not conduct that is in breach of an existing contract. *We have cautioned against confusing principles of contract with principles of fraud so that the elements of fraud are made out by a mere breach of contract*." *Winey v. William E. Dailey, Inc.*, 161 Vt. 129, 136 (1993) (emphasis added). In this case, the parties' contract is extremely complex and neither side performed according to its precise terms. There are no additional circumstances exhibiting fraud.

Based on the foregoing analysis, the following is a calculation of the amounts due and paid from January 2014 through March 2015 (monthly rent for the months from April 2015 to the month of hearing have been paid into court; rent escrow funds will be transferred to Plaintiff in satisfaction of rent due for those months):

| | | |
|---|---|---|
| Jan & Feb 2014 | $22 x 2 = | 44 |
| March-Nov 2014 | 22 x 9 = | 198 |
| December 2014 | 924 x 1 = | 924 |
| Jan, Feb, March 2015 | 746 x 3 = | 2,238 |
| Total | | 3,404 |
| | | |
| Less rent paid in 2014 | | - 500 |
| Unpaid rent due | | $2,904 |

Plaintiff continues to hold a security deposit on behalf of Defendants.

Under the Lease, Plaintiff is entitled to reasonable attorneys' fees. Plaintiff requests $1.920.00. The court has reviewed the attorney billing records and finds the fees requested are in a reasonable amount.

14

**Order**

Plaintiff's counsel shall prepare a Judgment for possession and unpaid rent in the amount of $2,904.00 plus costs and attorneys' fees and a Writ of Possession, which shall provide for execution with ten days' notice.

Dated at Montpelier, Vermont this _____ day of August 2015.

_____
Mary Miles Teachout
Superior Judge